

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

MIDFIRST BANK, )
           )
           Plaintiff, )
           )
vs. )        No. 03 C 4975
           )        Magistrate Judge Schenkier
SHEILA CURTIS, and )
LATASHA CURTIS, )
           )
           Defendants. )

## MEMORANDUM OPINION AND ORDER

On May 23, 2001, Sheila and Latasha Curtis obtained a mortgage from Homeside Lending, Inc. for property located at 5043 West Chicago Avenue in Chicago, Illinois. Thereafter, Homeside assigned the mortgage to Midfirst Bank. On July 18, 2003, Midfirst filed this mortgage foreclosure action as a result of the Curtises' default on the mortgage loan. On April 26, 2005, the district judge then presiding in the case entered an amended judgment of foreclosure (doc. # 12).

The amended judgment of foreclosure stated a total judgment indebtedness of $94,271.06. The Curtises were given until June 27, 2005, to redeem the property by paying judgment, together with attorneys' fees, costs, advances and expenses incurred thereafter with interest. The amended judgment provided that if the Curtises failed to pay that amount by June 27, 2005, Midfirst would have the right to sell the property to satisfy the amount due, "together with the interest, advances, and expenses incurred after judgment at the statutory judgment rate from the date of the Judgment."

The Curtises failed to pay the judgment, and thus failed to redeem the property. As a result, a Special Commissioner was appointed, and efforts to sell the property followed. After some initial

missteps, on December 21, 2006, a foreclosure sale was held, at which Midfirst made the highest bid for the property.[1]

Plaintiff now moves for approval of the sale and for immediate possession of the property (doc. # 50). That motion attaches the Special Commissioner's Report of Sale and Distribution. The Report states that since entry of the $94,271.06 judgment on April 26, 2005, an additional $19,851.99 in various advances, attorneys' fees and interests, bringing the total indebtedness to $114,133.05. Against this amount, the Special Commissioner credited $45,040.91 in insurance proceeds, obtained as a result of damage to the property in a fire that occurred on May 25, 2005. That left the unsatisfied portion of the judgment at $69,092.14, the amount Midfirst bid at the sale.

The Curtises have filed objections to the confirmation of the sale (doc. # 55).[2] In their objections, the Curtises do not claim that they or anyone else outbid Midfirst for the property at the December 21, 2006 sale, and they do not claim that there were any irregularities in the way that the sale was conducted. Nor do they dispute any of the expenses set forth in the Special Commissioner's Report, or the calculations prepared by the Special Commissioner. Rather, the Curtises seek to avoid the sale on the ground that there were irregularities and misconduct in connection with changes in the insurance on the property that took place in May 2005, and that in those circumstances, it would

---

[1]A public sale was held on May 23, 2006, at which the highest bid for the property was $64,224.00. The Special Commissioner moved to approve that sale (doc. # 24). However, that motion was withdrawn (doc. # 44), because of the manner in which the Special Commissioner conducted the sale. Specifically, the Special Commissioner had an employee attend the sale in his stead, which was impermissible because the Special Commissioner's attendance at the sale was a duty that he could not delegate (doc. # 63: Pl.'s Resp. to Objs. to Confirmation of Sale, at 5-6).

[2]The Curtises are represented in these objections by Lamont Cranston Strong. In September 2006, Mr. Strong sought leave to appear on behalf of the Curtises, even though at the time he also was representing another party, Mohna, Inc., that asserted that it should receive the property instead of the Curtises or any other bidder. In a Memorandum Opinion and Order dated September 22, 2006 (doc. # 39), we explained why Mr. Strong could not represent clients with competing claims to the same property. During a later proceeding in open court (doc. # 44), we also set forth certain prerequisites for Mr. Strong to satisfy before he could appear on behalf of the Curtises. Mr. Strong eventually satisfied those requirements, and thus was given leave to appear on behalf of the Curtises on January 24, 2007 (doc. # 56).

be inequitable to allow Midfirst to take the property. For the reasons set forth below, we disagree, and we grant Midfirst's motion.

**I.**

We set forth below the facts relevant to the Curtises objections. Those facts, insofar as they are relevant to those objections, are uncontested.

On January 13, 2003, Homeside assigned the Curtises' mortgage to Midfirst. At that time, and at all times relevant to this dispute, Midland Mortgage Company acted as an agent for Midfirst servicing mortgage loans. As part of its responsibilities as Midfirst's agent, Midland ensured that the properties under mortgages held by Midfirst had insurance coverage in the event of loss or damage to the properties (Pl.'s Resp. to Objs., Ex. A ¶ 4).

At the time of the assignment of the mortgage, the Curtises insured the property through a policy issued by State Farm. The Curtises were required to obtain insurance by the terms of the mortgage (*see* Pl.'s Resp. to Objs., Ex. C ¶ 4). The mortgage provided that in the event of a loss covered by insurance, the insurance company "is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly" (*Id.*). The mortgage further provided that insurance proceeds that the Lender received may, at the Lender's option, be applied to reduce indebtedness or to restore or repair damage to the property, but in no event would extend or postpone the due date of monthly payments or alter the amount of the payments (*Id.*).

Pursuant to the insurance policy issued by State Farm, Midfirst was required to inspect the property regularly and to notify State Farm of any changes in occupancy; pursuant to the servicing agreement, Midfirst assigned this responsibility to Midland (Pl.'s Resp. to Objs., Ex. A, ¶¶ 4, 7). Between March and July 2005, Midland received reports indicating that the Curtises were not living

3

at the property (*Id.* at ¶ 10). One of those reports was from the law firm representing Midfirst, which reported on May 19, 2005 that a person living near the property indicated that it was sitting vacant and was the scene of illegal drug activity (*Id.*, Ex. B, ¶¶ 4-6).

Midfirst provided this information to State Farm; however, it was up to State Farm to make its own determination of the occupancy status of the property (Pl.'s Resp. to Objs., Ex. A, ¶ 8). According to the Curtises, any reports of a change in occupancy were incorrect. The Curtises say that they continuously resided at the property from the date that they purchased it in 2001 through the time of the fire that occurred on May 25, 2005, and that they had not rented the property to anyone else (Defs.' Objs., Certification, ¶¶ 3-4). State Farm decided to cancel its policy, effective May 25, 2005 at 12:01 a.m. Consistent with that cancellation, on May 19, 2005, State Farm sent the Curtises a check in the amount $1,586.00 for a return of premium.

State Farm also notified Midland that the coverage would be terminated. The cancellation by State Farm of the insurance coverage placed the Curtises in default of Paragraph 4 of the mortgage, which required them to insure the property. In that event, under Paragraph 7 of the mortgage, the Lender "may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2 [of the mortgage]" (Pl.'s Resp. to Objs., Ex. C, ¶ 7). As a result, Midland procured replacement insurance coverage for the property from Empire Fire and Marine Insurance Company, so that there would not be a lapse in coverage. The term of that policy covered the period from 12:01 a.m. on May 25, 2005 to May 25, 2006. It appears that Midland listed itself as the insured, and the Curtises as additional insureds.

4

Thereafter, in early morning hours of May 25, 2005, after expiration of the State Farm policy but after the Empire policy became effective, the property was damaged in a fire. When Midland learned of the fire, it timely made a claim to Empire. After Empire completed its investigation, Empire paid Midland $45,040.91 on the insurance claim (Pl.'s Resp. to Objs., Ex. A, ¶¶ 12-13). Those proceeds were not kept by Midland, but – as the Special Commissioner's Report makes clear – were used to pay down the Curtises' indebtedness on the judgment of foreclosure.

## II.

The Curtises raise a number of objections to the way in which the State Farm policy was terminated, Midland's procurement of replacement insurance with Empire, and the ultimate payment of the insurance proceeds for damage to the property from the fire. We are not persuaded that any of those events caused injury to the Curtises, or provide a basis for declining to approve the sale.

## A.

The Curtises argue that the State Farm coverage never should have been terminated, because they never ceased occupying the property up until the fire that occurred on May 25, 2005. The Curtises claim that by reporting a change in occupancy, Midland tortiously interfered with their contractual relationship with State Farm.

We reject that claim. Under Illinois law, a party seeking to show tortious interference with contract must show, among other things, the alleged interferor's "intentional and unjustified inducement of a breach of the contract." *HPI Health Care Services, Inc. V. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). Alleged interference is not "unjustified" if it is privileged: that is, if the "defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *Id.* at 677.

5

For purposes of these proceedings, we accept the Curtises' certification that they continued to occupy the residence as of May 2005. However, we have been offered no evidence to contradict the sworn statements of Midland and Midfirst's counsel that they had received reports to the contrary, or that under the State Farm policy, Midfirst was required to notify the insurer of any change in occupancy. There is no evidence that Midfirst or Midland acted in bad faith in discharging that responsibility by informing State Farm about the reports they had received of a change in occupancy. Nor have the Curtises offered any reason why Midland or Midfirst would knowingly make a false report of a change in occupancy to State Farm, and thus jeopardize insurance coverage on the property that was the sole source from which Midfirst could recover the judgment amount if it was not redeemed by the Curtises. We conclude that plaintiff's actions in fulfilling that requirement was of at least equal value to the Curtises' contractual right to insurance coverage from State Farm. Thus, the Curtises' tortious interference argument fails.

Moreover, the Curtises have not explained how they would have been in a better position had the property been insured by State Farm rather than Empire at the time of the fire. The Curtises have offered no evidence that the coverage provided by State Farm was superior to that provided by Empire, such that there would have been a larger payment for the loss had State Farm been insuring the property. We have been offered no reason to believe that Midfirst would have its agent, Midland, procure less coverage than was previously available to protect the property, which was the principal source for Midfirst to recover on the judgment if it was not redeemed by the Curtises.

Nor can the Curtises claim that they would have received the insurance proceeds in hand if State Farm had been insuring the property at the time of the fire and paid on the loss. Under Paragraph 4 of the mortgage, State Farm would have been required to make any payment for loss due

6

to the fire directly to Midfirst. Moreover, whether the property was insured by State Farm or Empire, any insurance proceeds resulting from loss to the property would have been applied by Midfirst in the same way by virtue of Paragraph 4 of the mortgage: to restore or repair the property or to reduce indebtedness (at Midfirst's option). As a Special Commissioner's Report makes clear, that is exactly what happened to the insurance proceeds received from Empire: they were applied to reduce the Curtises' indebtedness on the judgment. The Curtises have failed to establish any prejudice from the termination of the State Farm policy, or that the termination of that policy provides any basis for declining to confirm the sale.

**B.**

The Curtises also argue that Midland could not properly be identified as an insured on the Empire policy, because it was not the mortgagee: it was only the servicing agent of the mortgagee, Midfirst. According to the Curtises, since they were listed as additional insureds on the Empire policy, and Midland had no insurable interest, the Curtises are the only persons entitled to receive payment from Empire for the damage to the property.

We disagree. Under Illinois law, "[m]ortgagors and mortgagees each have an insurable interest in the mortgage property and the interests of both may be covered in one policy, or each may take out a separate policy . . ." *Le Doux v. Dettmering*, 43 N.E. 2d 862, 867 (Ill. App. 1942). Thus, there can be no dispute that when State Farm cancelled the insurance coverage on the property, Midfirst had the right to obtain replacement insurance. There is also no dispute that Midland acted as Midfirst's servicing agent and, in that capacity, had the responsibility to ensure that there was insurance coverage. Illinois case law has recognized that this is a typical responsibility of servicing agents, who often "advance their own funds to pay taxes or insurance premiums on behalf of

7

mortgagees when mortgagors fail to pay sufficient funds into escrow." *Advance Mortgage Corp. v. Concordia Mutual Life Assoc.*, 481 N.E.2d 1025, 1029 (Ill. App. 1985).

There is no evidence that Midland failed to disclose to Empire its role as servicing agent for Midfirst. Certainly, had Empire concluded that Midland obtained coverage under false pretenses, Empire would not have paid on the loss in November 2005. Moreover, the evidence shows that Midland did not obtain the insurance for its own benefit, and did not use the proceeds for its own benefit. Rather, the insurance proceeds were used to reduce the Curtises' obligation to Midland on the amended judgment of foreclosure – which is precisely what would have occurred had State Farm been the insurer at the time of the fire, and had paid for the loss.

## C.

The Curtises further claim that because of the change in insurance coverage, they were deprived of the right to redeem the judgment at an amount $45,040.91 less than the foreclosure judgment amount. That argument fails for several reasons.

*First*, the premise of the Curtises' argument is that Midland held the money, and that Midfirst never received the benefit of it. The Special Commissioner's Report shows that is not the case. The $45,040.91 received from Empire was applied to reduce the amount due by the Curtises on the amended judgment of foreclosure.

*Second*, the Curtises are incorrect that the $45,040.91 in insurance proceeds could have assisted them in redeeming the property during the time period allowed by the district judge. The redemption period expired as of June 27, 2005; the proceeds from Empire were not received until November 10, 2005, well after the redemption period had expired. Thus, the insurance proceeds were not paid in time to assist the Curtises in raising the money necessary to pay off the April 26,

8

2005 judgment of foreclosure. Indeed, the Curtises offer no evidence that they would have been able to come up with the amount of money necessary to pay off the judgment within the redemption period, even with a credit of $45,040.91 for the insurance proceeds.

*Third*, we note that prior to the December 21, 2006 sale, Midfirst offered the Curtises an opportunity to pay off the mortgage and redeem the property (Pl.'s Resp. to Objs., at 6). Presumably, that pay off would have reflected a reduction for the $45,040.91 in insurance proceeds. The Curtises failed to avail themself of that opportunity, which necessitated the December 2006 foreclosure sale which we are now asked to confirm. Likewise, the Curtises did not bid on the property at the foreclosure sale. And, in their papers objecting to confirmation of the sale, the Curtises do not indicate that they stand ready and able to pay off the balance of the judgment amount (as increased by various costs and interest, and then as reduced by application of the $45,040.91 in insurance proceeds). Under these facts, we find to the extent the Curtises were unaware of an insurance payment until sometime after November 2005, that lack of knowledge did not prejudice them in any efforts to save their property.

## CONCLUSION

We take no pleasure in approving an order that will result in the Curtises losing ownership of their property. But, we also must recognize that with property ownership come obligations. We find ourselves at this juncture because the Curtises defaulted on those obligations and, after being given an opportunity to redeem the property, they failed to do so. The objections that the Curtises have raised do not undermine the validity of the amended judgment of foreclosure; they do not challenge the validity of the process by which the December 2006 sale was conducted, or claim that there was someone other than Midfirst who made a higher bid; and they do not challenge the

calculations set forth in the Special Commissioner's Report. The objections that the Curtises raise do not have merit, and do not show that they have been prejudiced by changes in insurance coverage that occurred in May 2005. Accordingly, we grant plaintiff's motion for an order approving the sale and for immediate possession (doc. # 50). We will enter a separate order today reflecting that approval.[3]

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: March 23, 2007**

---

[3]At a proceeding on January 24, 2007, the Court raised questions about certain of the expenses listed by the Special Commissioner, and asked for an explanation as to whether those expenses should not be included because they were the result of a prior sale that had to be vacated. In its submission, Midfirst has explained the circumstances that led to the vacation of that prior sale (Pl.'s Resp. to Objs., at 4-6). We are satisfied that the sale was vacated through no fault of Midfirst. Accordingly, we approve the complete list of expenses and calculations set forth in the Special Commissioner's Report.